Bragdon *v.* Appleton Mutual Fire Insurance Company.

| 42 | 259 |
| 99 | 493 |

OLIVER BRAGDON & *ux. versus* APPLETON MUTUAL FIRE IN-
SURANCE COMPANY.

After the plaintiff in a suit has introduced all his evidence, the presiding Judge
may order a nonsuit, without a motion to that effect by the defendant.

The refusal of the Court to order a nonsuit, on motion of the defendant, is not
subject to exception; but it is otherwise in regard to a ruling of the Court
ordering a nonsuit.

If evidence is introduced in defence, the cause must be submitted to the jury,
unless the plaintiff consent to a nonsuit.

The rule that a nonsuit cannot be ordered, except by consent, after testimony
has been introduced in defence, has been several times recognized by this
Court, and it is believed has been generally adhered to in practice in this
State.

When a policy of insurance has been executed, and notice thereof given to the
assured, *its actual delivery is not necessary to complete the contract.*

ON EXCEPTIONS from *Nisi Prius*, CUTTING, J., presiding.

This was an action of ASSUMPSIT upon two contracts of in-
surance alleged to have been made by the defendants. They
filed specifications of defence, and pleaded the general issue.

The plaintiffs introduced deeds and other evidence tending
to prove that the female plaintiff was the owner in fee of the

property destroyed by · fire, at the time the contracts were alleged to have been made, and at the time of the loss. They also introduced evidence for the purpose of showing the manner in which the insurance was effected and through what agents.

The defendants introduced testimony contained in depositions in defence.

After the evidence was in, the Court directed a nonsuit, to which the plaintiffs excepted.

*Snell* and *H. W. Paine*, for plaintiffs.

A nonsuit cannot be ordered, except by consent, after testimony has been introduced in defence. *Lyon* v. *Sibley*, 32 Maine, 576; *Emerson* v. *Joy*, 34 Maine, 347.

The plaintiffs had made a case proper for the consideration of the jury, and it was for the jury to decide whether plaintiffs have paid the cash premium.

And the jury would have been authorized to find a payment. *Taylor* v. *M. Fire Ins. Co.*, 9 Howard, 390.

*L. M. Morrill*, for defendants, contended:—

1. That the Court may order a nonsuit when the testimony introduced by the plaintiff will not authorize the jury to find a verdict in his favor. 20 Maine, 317.

2. That the fact of testimony having been introduced by the defendant, will not change the rule of practice, nor take from the Court the power to order the nonsuit, if such evidence would not change the result.

TENNEY, C. J.— The nonsuit, in this action, was directed by the Judge, after the evidence on both sides had been presented to the jury. To this direction, the plaintiffs excepted.

After the plaintiff in an action has adduced the evidence on which he relies for its maintenance, the presiding Judge may order a nonsuit, without being moved by the defendant to do so. But to such order, the plaintiff is entitled to his exceptions. But the refusal to direct a nonsuit, upon motion, is not subject to exceptions.

If evidence is introduced in defence, the truth of this evi-

dence, if favorable to the defendant, cannot be assumed by the Judge, but must be submitted to the jury.

When the plaintiff's evidence, taken in its full strength, has no tendency, in the opinion of the Judge, to maintain the issue for him, it is an useless consumption of time to hear evidence in defence, and after that direct a nonsuit. It may be true, that the evidence of the defendant cannot be regarded as giving any strength to the plaintiff's case, as it stood, when he stopped, but it is proper that there should be some uniform rule of practice in this respect. And such a rule has been recognized in the cases of *Lyon* v. *Sibley*, 32 Maine, 576, and *Emerson* v. *Joy*, 34 Maine, 347; and, it is believed, that this rule has generally been adhered to in practice.

The ground upon which the liability of the company is denied, is, that the policies were not delivered; and that this omission was because the cash premium was not paid, as the by-laws required.

The plaintiffs' evidence, if true, showed that Boyd was the general agent of the company, and that Moody, of the firm of Fellows & Moody, was also an agent; and from the fact, that premiums for insurance were paid when he and Boyd were present, and he was unable to state whether it was paid to one or the other, it *may* be a legitimate inference, that it was a part of Moody's business under his agency to receive money for the company. These agents went to the village of the residence of the plaintiffs on the 7th day of October, 1853; after certain negotiations with Bragdon, the plaintiff, applications were prepared by Boyd, upon the request to be insured from that time, and signed by both plaintiffs, in a manner satisfactory to Boyd, who said the policies should be made without delay. Moody told Bragdon, during the negotiations, that it made no difference whether he paid the cash premium at that time, or when he should take the policies, and he did not pay it. Bragdon also asked Boyd for a copy of the by-laws, and was told by him, that he had none with him, but that he would be furnished with a copy on the policies. It appears further, from the evidence, that it was the

understanding that the policies would be made at once, as the president of the company was in an adjoining town, and should be left with Fellows & Moody, at Waterville, and no time was fixed when Bragdon should take them. The policies were made and signed, and put into the hands of Fellows before the loss; but Fellows was afterwards ordered by the president not to deliver them, and they were subsequently taken back. No evidence introduced by the plaintiffs, tended to show that Bragdon was informed by any agent of the company, or knew, or had reason to suppose, that the by-laws required payment of the cash premium to make the policies effectual. The plaintiffs did not introduce at the trial the by-laws, and it is understood that the specifications of defence did not require the production thereof, or of the policies, to make out a prima facie case for the plaintiffs.

From the foregoing facts, was there nothing for the jury to determine? If there was, and they might have found from the evidence that the right of the company to receive the cash premium before the delivery of the policies, was waived, by the fact, that they were left by the president with Fellows & Moody, they had become effectual from that time, notwithstanding Bragdon had not received them. "When a policy of fire insurance has in fact been executed, and notice of the execution been given to the assured, its actual delivery is not essential to the completion of the contract." Angell on Fire and Life Insurance, 67; *Kahue* v. *Ins. Co. of North America,* 1 Wash. C. C. R. 93.

If the policies had not been withdrawn from the possession of Fellows, or directed not to be delivered to Bragdon, by the president, and no loss had occurred, would not the plaintiffs have been liable for the premium to the company, though the plaintiffs had refused to take the policies? If such liability had existed, it cannot be contended that a corresponding obligation on the part of the company did not attach.

*Exceptions sustained, verdict set*
*aside, new trial granted.*

RICE, APPLETON, MAY and GOODENOW, J. J., concurred.

CUTTING, J., non-concurred, and gave the following dissenting opinion:—

This action is brought to recover the amounts insured on certain buildings and machinery, included in two policies, dated October 7th, 1853.

The plaintiffs introduced Joseph Fellows, who testified that on Saturday, Oct. 8th, 1853, late in the afternoon, Wm. Pulsifer, (the defendants' president,) delivered to him the policies, and told him to put them into the safe and take care of them, (he was an express agent); again saw Pulsifer, on Sunday, at Kendall's Mills, and was told by him not to deliver the policies. On Monday afternoon Bragdon called on him and demanded the policies; he had them at that time, but did not deliver them. On Tuesday morning he returned them to Pulsifer; he was one of the firm of Moody & Fellows, who were agents of the defendants.

Also, Joseph G. Moody, who testified, that on Oct. 7th, 1853, he, acting as defendants' agent, went with Edward A. Boyd, their general agent, to obtain insurance at Kendall's Mills; examined the premises, and Boyd made out two applications for Bragdon; the understanding was, that the policies should be made at once, as the president was then at Waterville, (the town adjoining,) and left with Moody & Fellows at that place; no time was fixed when Bragdon should take them; Bragdon asked him, if it would make any difference whether the cash premiums were paid then, or when he took the policies; he told him it did not; the cash premiums were not paid; they told Bragdon the policies would be made without delay. The applications were handed to the president on their return to Waterville. At the same time, they took an application for one Ellis, who paid $29,75, the cash premium, for which Boyd gave him a certificate, and told him he was insured from that time; this application was taken away with the others. Bragdon was present when the certificate was given; during that conversation between Boyd and Ellis, Bragdon asked him, (witness,) if it made any difference to him, whether he paid then, or when he took the policies; he

told him that it made no difference to him, (witness.) Bragdon had previously expressed a wish to him to be insured from that time. Bragdon asked Boyd for a copy of the by-laws. Boyd told him, he had none with him, that he would be furnished with such copy on the policy; there were no rules or regulations of the company read by Boyd to Bragdon. On Sunday, Pulsifer told him to tell Fellows, his partner, not to deliver the policies to the parties, but to deliver them to him, (Pulsifer.)

Also, John B. Bradbury, who testified, that, on Oct. 10th, 1853, about one o'clock, P. M., Bragdon called him into the office of Moody & Fellows; inquired of Fellows if he was the agent of the insurance company; he said he was; Bragdon called for his policies; demanded them, and tendered to Fellows $52,50 in American gold; he counted it, as Fellows declined to receive it; at Bragdon's request he took and kept it until the 14th of this month, (December, 1855,) when he deposited it with the clerk of this Court; Fellows said he had the policies, but declined to deliver them.

The foregoing was the substance of all the evidence introduced by the plaintiffs. The pleadings admitted that the buildings were consumed by fire on Saturday night, as alleged in the writ.

The defendants introduced the deposition of Edward A. Boyd, and the affidavit of Pulsifer, to the latter of which, were annexed the two policies, with the charter and by-laws of the company, on the same sheets.

Thereupon the Judge directed a nonsuit; upon which ruling the questions arise. — Was there any fact for the jury to settle ? Were the plaintiffs entitled from the evidence to recover as a matter of law ?

The nonsuit was ordered solely upon the testimony produced by the plaintiffs, if we except the policies and the charter and by-laws attached, the former of which were the instruments declared on, and consequently their execution could not be, and was not controverted by the plaintiffs; the other documents were made a part of the contracts and referred to

Bragdon *v.* Appleton Mutual Fire Insurance Company.

therein in these words, "subject to the provisions, conditions, and limitations of the charter and by-laws of the company." The construction of all these written documents was for the Court and not for the jury. It is not pretended by the counsel for the plaintiffs, in argument, neither do we perceive that, in the affidavit of Pulsifer or the deposition of Boyd, there is one particle of testimony beneficial to the plaintiffs, and as to so much of the same as operated against them, the ruling has afforded them no cause of complaint; for, if the jury would not be authorized to render a verdict in their favor, upon their own showing, they certainly could not when connected with that of the defendants.

What was there for the jury to find from the plaintiff's own testimony? Could they, under proper instructions from the Court, upon the effect of the documentary evidence, determine that the policies had been delivered with an understanding of the parties to take effect previous to the fire?

Moody swears that the policies were to be left with himself and his partner, in the express business, at Waterville; that no time was fixed when Bragdon should receive them; and that they were the agents of the company.

Fellows, the partner, testifies that Pulsifer delivered the policies to him, and requested him to place them in the safe and to take care of them. And it appears that, subsequently, (after the fire,) they were returned to Pulsifer, never having been delivered to, or received by, the plaintiffs.

It may be said, perhaps, which however was not said in the argument, that the custody of the policies by Moody & Fellows, was for the benefit of the plaintiffs, and the possession by the former was for the use of the latter; and that such delivery was unconditional. But when we look into the by-laws, which exhibit the extent of the agent's authority, we perceive, notwithstanding any supposed or assumed authority to the contrary, that no delivery could be effectual, until the cash premiums of $48,50 were advanced.

Art. 8th, reads thus: — "Each person shall pay, upon the

execution of his policy, *and before its delivery*, the premium thereon," &c.

It may again be contended, which was not done in the learned arguments of the counsel, that Bragdon had some assurances, and some reason to expect, that he was insured from the time his applications were perfected and passed over to the agents, since, at the time Ellis paid his money and received the certificate, Bragdon inquired of Moody, whether it would make any difference if he paid the cash premiums then or when he took his policies; and the reply was, that it would not, or would not, to him. Such an agreement, if made, was not only wholly unauthorized, but absolutely prohibited by Art. 6th of the by-laws, which is, that "no insurance shall take effect until the application has been approved by the president, or two of the directors, and until the terms of insurance fixed by the directors, have been accepted by the applicant, and the cash premium been paid," &c. And the last clause in Art. 12th is, "no insurance agent or broker forwarding applications to this office, is authorized to bind the company *in any case whatever*."

The plaintiffs' evidence shows no compliance with the by-laws, but the reverse, as to the payment of the cash premiums, and consequently they have wholly failed to substantiate one of the material allegations in their writ.

But it is contended by the plaintiffs' counsel, and upon this point they seem to rest the case, so far as the merits are concerned, that the jury would have been authorized, from the evidence, to find a payment; or in other words, that a promise to pay is equivalent to a payment; and on this point refer to an able opinion in 9 Howard's U. S. Rep. 390. Such a law undoubtedly would be very acceptable to a large class of debtors, and perhaps even to the defendants in the last resort.

The plaintiffs may have been misled, but it was their duty to have informed themselves upon what terms and conditions they could be insured, agreeably to the company's charter and rules, which by statute are to accompany each policy, and to have known that any contract made in derogation thereof,

would not be binding. *Barrett* v. *Union M. F. Ins. Co.*, 7 Cush. 175; *Real Estate M. F. Ins. Co.* v. *Roessle*, 1 Gray, 336.

The defendants belong to a class of corporations, which, when properly and legitimately conducted, are of great public utility. They are instituted for the mutual benefit of their members, who consist only of such as are insured therein, and whose policies are the only evidence of their membership. Their authority is derived from their charters, and from such rules and regulations as they may deem proper to adopt and promulgate, not inconsistent with the constitution and laws of the State. They must, from necessity, employ agents, whose acts, to be valid and binding, must be within the limits of their delegated powers. And "an act, not performed according to the requisites of the law, cannot be considered as the act of the company." *Head* v. *The Providence Ins. Co.*, 2 Cranch, 127; *Beatty* v. *The Marine Ins. Co.*, 2 Johns. 109.

It being manifest, therefore, that the plaintiffs have offered no evidence sufficient in law to substantiate their claim, but have proved directly the reverse, and that the defendants' evidence has afforded them no aid, I now pass to the consideration of the question, which seems to be relied on as the principal ground for sustaining the exceptions, namely, whether a nonsuit can be ordered, except by consent, after testimony has been introduced in defence.

In *Cole* v. *Bodfish*, 17 Maine, and cases there cited, it has been settled, that "according to our practice, a nonsuit may be ordered by the Court, if, upon the plaintiff's own showing, his action is not sustained, subject however to his right to except to the opinion of the Judge."

It is difficult to perceive upon what principle a nonsuit may not as well be ordered after as before the defendant has introduced his evidence, provided such evidence has not the least tendency to benefit the plaintiff. It can be, at most, but a distinction without a difference, possessing not even the merits of a legal fiction. The plaintiff has, in both instances, to rely solely upon the strength of his own testimony. Suppose,

by way of illustration, that the plaintiff introduces a witness, who swears to nothing favorable to his claim, but adversely to it, and the defendant, instead of moving for a nonsuit, produces a witness who testifies to no fact material to the issue, or if material, unfavorable to the plaintiff, or a release of the plaintiff's cause of action, the execution of which is not disputed, and then moves for a nonsuit; can it be contended that the mere introduction of such evidence presents a question of fact exclusively for the jury, and that the functions of the Court are to be suspended until after solemn arguments of learned counsel, and then to be only exercised by instructing the jury to return their verdict for the defendant? It would seem that such a procedure would render the administration of justice not only tedious in some cases, but ridiculous. And such substantially is the doctrine contended for by the plaintiffs.

If the plaintiff cannot resist a nonsuit after his evidence is closed, how can he occupy any stronger position, when the defence has disclosed nothing in his favor? This question is substantially answered in *Hoyt* v. *Gilmore*, 8 Mass. 336, which was likewise an action on a policy of insurance; testimony had been introduced on both sides, and a nonsuit was ordered without consent. The Court, in delivering their opinion, remark:—"Whether fraud be a question for the Court or jury, yet if, upon the facts in evidence in this case, the jury had given the plaintiff his premium, we should not have hesitated to set aside the verdict." And the nonsuit was confirmed. So in the cases of the *Salem Bank* v. *Gloucester Bank*, 17 Mass. 8, 32; and the *Gloucester Bank* v. *Salem Bank*, 17 Mass. 33, 46.

In *Janson* v. *Acker*, 23 Wend. 480, the plaintiff claimed title to the property under (and introduced,) a bill of sale from one *Anderson*. The defendant, being an officer, read in evidence an execution against *Anderson*, &c.; and, on his motion, a nonsuit was ordered. Justice BRONSON, in pronouncing the opinion, observes, that "the exception is mainly directed against the power of the Judge to nonsuit the plaintiff after

evidence had been given on both sides, a position which cannot be maintained."

The rule is accurately and concisely stated by the Court, in *Pratt* v. *Hull*, 13 Johns. 335, thus; "we must assume that there was no dispute about the facts before the Court, or any weighing of testimony falling within the province of the jury; and, therefore, it was a pure question of law, whether, under a given state of facts, the plaintiff was, in law, entitled to recover. And, unless this was a question for the Court, there is no meaning in what has been considered a salutary rule in our courts of justice, that, to questions of law, the Judges "are to respond, and to questions of fact, the jury." Likewise, in the case now under consideration, there was no dispute about the facts, nor any testimony to be weighed. The plaintiffs had proved that the cash premiums had not been paid, which was made by the by-laws one of the indispensable prerequisites to the delivery of the policies; and they had derived no "aid from the defendants' testimony," either on the direct or cross-examination, and consequently the ruling, the subject matter of these exceptions, was, in the language of this Court, in *Lyon* v. *Sibley*, 32 Maine, 576, cited by defendants' counsel, "based solely upon that principle which secures to the Court and the jury their respective provinces." The ruling did in no particular conflict with the reasons assigned in that case for sustaining the exceptions. There the plaintiff had introduced proof that he was once the owner of a mill log, which subsequently had been used by the defendant. In defence, it was shown that the defendant and one *French* had used the log as a portion of the materials in constructing their boom, which they afterwards sold to one *Ward.* From this testimony, it is difficult to perceive, why the plaintiff, instead of being nonsuited, should not have recovered on one of the money counts. At all events, it is manifest that the province of the jury was invaded. One *dictum*, however, has crept into the language of the Court, in that opinion, which should here be corrected. The Court is made to say, that "after evidence on both sides, the defendant has a right to in-

sist that a verdict be rendered." If such be the rule, it is not made apparent, how the *plaintiff*, the excepting party, should derive benefit, because the *defendant* may have been " aggrieved." Such, however, I conceive not to be the rule of practice, as adopted in this State or in Massachusetts, with certain exceptions created by statute; such, for instance, as where an account is filed in set-off. But, before the cause is committed to the jury, it is discretionary with the presiding Judge to permit the plaintiff to become nonsuit, as is settled in *Means* v. *Wells*, 12 Met. 362, (and by English and American authorities there cited,) in which " it is held by the Court, that where a discontinuance is not a matter of right, it may be granted by the Court on motion and on good cause shown." And provision is made, in contemplation of such results, by R. S., c. 115, § 89, for the payment of the cost in the former, before the party can commence another suit for the same cause of action. This principle is also recognized and enunciated in *Theobald* v. *Colby*, 35 Maine, 179.

The case of *Emerson* v. *Joy*, 34 Maine, 347, is in harmony with the decisions to which I have already referred. The plaintiff had established his claim, and the nonsuit was ordered upon testimony introduced by the defendant, the credibility of which was for the consideration of the jury and not for the Judge; if not believed, the plaintiff was entitled to recover. The subsequent and final remark of the Court could have relation only to the subject matter of the evidence in that suit, and not to evidence irrelevant, or about which there is no dispute. The conclusion to which I have come, therefore, is, that the ruling was correct, and that the exceptions should be overruled.