|100 | 223|
|100 | 409|

| 100 | 223 |
| 101 | 453 |

| 100 | 223 |
| f106 | 290 |

### DILLA McTAGGART, Admx.,

*vs.*

### MAINE CENTRAL RAILROAD COMPANY.

## Waldo.    Opinion May 19, 1905.

*Master and Servant.    Negligence.    Reasonable Care.    Scope of Employment.*
*Evidence.*

1. When a case is reported to the law court, with a stipulation that it is to be heard as if a verdict had been rendered for the plaintiff, and a motion for a new trial had been filed by the defendant, all conclusions and inferences of fact, which a jury would have been warranted by the evidence in finding for the plaintiff, must be found by the court for the plaintiff.

2. It is the duty of a master to exercise reasonable care so to place its appliances, boilers and pipes, as to make it reasonably safe for the servant to perform any service which the master has any reason to expect that the servant may properly do, at that place, by virtue of his employment; and omission to exercise such care is negligence.

3. It matters not whether the appliance is so placed as to be safe or unsafe as to other servants in the performance of their respective duties.

4. The plaintiff's intestate, a baggage master in the employment of the defendant, was requested while in his car in the train, by one of the station agents and telegraph operators along the line to take a telegraphic message addressed to one of defendant's construction crew, and to throw it off when the train reached the place where the crew was at work. It is claimed that while the baggage master was engaged in throwing off the message and while standing on one of the steps at the rear end of his car, his head was struck, and he was killed, by a perpendicular iron pipe erected by the defendant, and standing about six inches from the outside of the baggage car as it passed. He was seen to throw off the telegram twenty-five feet before he reached the location of the pipe, but no one saw the accident itself. His dead body was soon after found in a coal bin twenty-seven feet from the pipe on the other side from where the telegram was thrown off. The defendant's station agent acted as telegraphic operator for the commercial business of the telegraph company, remitting all proceeds to the latter company, but being himself paid for his services both as such agent and operator, by the defendant. By virtue of its contract with the telegraph company, the defendant agreed to deliver such commercial or public messages as were received. The case otherwise

discloses no special authority in the station agent, or duty in the baggage master.

5. The court is of opinion that the case fails to show that the station agent was authorized to require the baggage master to undertake the delivery of a telegram by throwing it off a moving train, or that it came within the scope of the baggage master's employment to perform such a service. Nor does the case show any such custom of the station.agent and baggage master to forward and deliver messages in this way, from which it might be inferred that the defendant knew and assented to the practice. Therefore it is held that the defendant was not bound to anticipate the performance of any such service by the baggage master, as was undertaken in this case, and did not owe him the duty of providing so that he might do it safely.

6. It is held further, that, even if the foregoing were otherwise, the defendant had no reason to anticipate that a baggage master in a car with two high and wide doors on the side, as here, made on purpose to be used by him, would leave the car and go down upon the lower steps, as the deceased must have done, if he was hit by the pipe, for the purpose of throwing off a message, when he could have done it safely and conveniently from one of the side doors.

7. The court is further of opinion that it is not proved that the deceased was hit by the pipe at all. He may have been; he may not have been. The train passed slowly over the bridge, and then accelerated its speed. If then the deceased lost his balance and fell upon the coal bin, as he might have done, all other known conditions would be met, as well as by the theory that he was hit by the pipe. As between these two possible causes, it seems to be purely conjectural which is the true cause. The court cannot, and a jury should not, select as between conjectures, unless there is something more which may lead a reasoning mind to one conclusion rather than to the other. The court is of opinion that there is no such determining factor in this case.

On report. Judgment for defendant.

Action on the case to recover damages for wrongful injuries causing the immediate death of John McTaggart, the plaintiff's intestate. After the evidence had been taken out, it was agreed that the case should be reported to the Law Court, with the following stipulations: "The case is to be heard as if a verdict had been rendered for the plaintiff and a motion had been filed by the defendant for a new trial. If upon the admissible evidence the action is sustainable, judgment is to be rendered for the plaintiff for $5,000 damages; otherwise judgment for the defendant. The defendant is to carry the case forward."

The case is sufficiently stated in the opinion.

*R. F. Dunton and John R. Dunton,* for plaintiff.
*C. F. Woodard,* for defendant.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

SAVAGE, J.    Case for wrongful injuries causing immediate death of John McTaggart, plaintiff's intestate.    This case is now before us on report, with a stipulation that it is to be heard as if a verdict had been rendered for the plaintiff, and a motion had been filed by the defendant for a new trial.    All conclusions and inferences of fact, therefore, which a jury would have been warranted by the evidence in finding for the plaintiff, must be found by us for the plaintiff. Substantially all the evidence was put in by the plaintiff, and there is little dispute, so far as it goes.

It appears that for some time prior to the injury complained of, a construction crew of the defendant had been repairing the abutments of a bridge on the "Belfast Branch" between Unity and Burnham Junction.    Not far from the northerly end of the bridge and towards Burnham, a platform had been erected, at about the level of the rails.    Upon this platform stood a donkey engine and boiler, the latter being about four feet from the rails.    Northerly of the engine and boiler was a coal bin.    Southerly, towards the bridge and about twenty-five feet distant from the engine was a derrick which was operated by the donkey engine.    At this point the railroad runs upon a narrow and somewhat steep embankment, with water on both sides.    On August 21, 1903, a two inch iron steam pipe was connected with the top of the boiler, and extended towards the railroad track about three feet, then down perpendicularly to within eighteen inches of the level of the rails, then turned towards the rail three inches, then down to the ground and under the rails to a pump below.

McTaggart, the deceased, was a railroad man of long experience. He had been section foreman, foreman of construction crew, and brakeman, and for eleven years before his death had been baggage master on the "Belfast Branch."    He made two round trips a day

between Belfast and Burnham, and had therefore passed the engine and boiler above spoken of four times daily since they had been placed in position. On several occasions, while his train waited at Burnham, he had gone from Burnham to the bridge in question as brakeman on a construction train, and when at the bridge, had been on the platform where the engine and boiler were, remaining about there from half to three-quarters of an hour. One of these occasions at least was after August 21, when the steam pipe was connected with the boiler.

On the morning of September 4, 1903, one Whitehouse, the station agent and telegraph operator at Unity, handed McTaggart, in the baggage car of the train, a telegram addressed to one of the construction crew at the bridge, and asked him to throw it off as the train passed the bridge. Whitehouse had tied the telegram to a stick about a foot long. He told McTaggart the contents of the message, which was that the wife of the addressee was sick. He also told him that they wanted to get the message to the man so that he could go home to his wife as soon as possible. As the train approached the bridge it slowed down somewhat, and started up again after it crossed. While the baggage car was crossing the bridge, the engineer of the donkey engine, standing by the engine, saw McTaggart standing on one of the steps at the rear end of the car, waiving the message with one hand and holding on to the car rail with the other. The witness could not tell which step he stood upon. When he got opposite the derrick, about twenty-five feet southerly from the boiler, he threw out the message. He was then standing "about square on the steps or platform." What happened afterwards was not seen by any human eye.

As the train passed, the engineer, unconscious that McTaggart had been struck by any object, picked up the message and started to deliver it. But immediately it was discovered that McTaggart was lying dead in the coal bin, twenty-seven feet northerly from the boiler. His face and head were bruised in several places. The most noticeable bruise was a long, straight one just back of the right ear. From these circumstances, the plaintiff contends that a jury would have been warranted in finding that as McTaggart passed the boiler, his head hit the steam pipe, causing the long, straight bruise,

and he was thereby knocked off the steps of the car.    The height of the steam pipe and its distance from the baggage car as it passed is left uncertain, but we think a jury might properly have found that it extended two or three feet above the floor of the car, and was about six inches from the outside surface of the car.    The outside of the lowest step was two inches inside of the outside of the car.    That step was two feet and ten inches lower than the floor of the car.    If the plaintiff's theory is right, the position of the bruise referred to shows that after McTaggart threw out the message, he leaned forward bringing his head six or eight inches outside the car, and was looking backward when he was hit by the steam pipe.

Various defenses are strongly urged.    We shall not have occasion to examine them all.    In the first place, assuming that he was hit by the steam pipe, it is contended that at the time of his injury McTaggart was not engaged in the performance of any service which he owed the defendant by virtue of his employment, that it was no part of his duty as baggage master to deliver telegrams along the route, and, therefore, that it was not the duty of the defendant to anticipate that he would do so, and so to arrange its boilers and steam pipe that he might do so safely.    This question must be considered in the light of the defendant's duty to the deceased at the time.    It was its duty to exercise reasonable care so to place its boiler and pipe as to make it reasonably safe for him to perform any service which it had any reason to expect that he might properly do at that place, by virtue of his employment.    Any omission to exercise such care would be negligence as to him.    It matters not whether the pipe was so placed as to be safe or unsafe as to other servants in the performance of their respective duties.    It was not negligence, as to McTaggart, unless there was a failure of duty on the part of the defendant with respect to service reasonably to be expected of him in his employment, and service performed in a reasonable and proper manner.

The case shows that the telegraph business, along with the Belfast Branch, both railroad and commercial, was done on a single wire, under a joint contract between the defendant and the Western Union Telegraph Company.    The telegraph company furnished

the poles and wire and the general outfit, which the defendant had the right to use for its own business without the payment of tolls. The station agent at Unity, employed and paid by the defendant, was also the telegraph operator there, and handled all telegraphic business, without expense to the telegraph company. As to commercial business he acted under the rules, regulations and orders of the telegraph company, and remitted all proceeds to that company. By the contract referred to, the defendant agreed to deliver such commercial or public messages as were received. We think, however, it is fairly to be inferred from the evidence that in a case like the present where the addressee was two miles distant from the office, delivery was obligatory only when charges for delivery were guaranteed beforehand. This, however, is immaterial, if the defendant, or its servants, by authority of the defendant, which is the same thing, undertook to deliver the message. The only fair inference to be drawn from the testimony of the station agent is that he understood the message was being forwarded as a matter of accommodation, and not as a matter of duty. But even that makes no difference, if the station agent was authorized to require the service, and it came within the scope of McTaggart's employment to perform it, unless it is shown that McTaggart undertook to carry it as a matter of accommodation, and not of duty. The service here was the carrying of a telegraphic message to be delivered by throwing it off a moving train. This case discloses no special authority in the station agent or duty in the baggage master. The station agent being inquired of about his duties as station agent and telegraph operator, replied "about everything around a country station," and in the same connection that he had " general direction of the business of the road at that point," which is of course, the ordinary duty of a station agent. It does not mean that he was an unlimited agent. *Davies* v. *Steamboat Company,* 94 Maine, 379. The ordinary duties of such agents and of baggage masters are now so well known and so generally uniform that the court may take judicial notice of them. But if more than that is claimed, it must be proved. Nor does the case disclose any such custom of the station agent and baggage master to forward and deliver messages in this way, from which it might be inferred

that the company knew and assented to the practice. There was evidence indeed that McTaggart had been seen to throw off letters or telegrams at this place several times before. The case does not show which. Therefore it cannot be said that he threw off telegrams. And if he threw off letters the natural inference would be that he did it as an accommodation.

Taking the case as a whole then, can it be said that McTaggart, in undertaking to deliver the message, was acting within the scope of his employment? That is to say, was he doing something which the railroad company was bound to anticipate that he might do, and which, therefore, it was bound to provide for his doing safely? We think not. The railroad company may have been under obligations to deliver the message. It may not have been improper for the station agent to ask McTaggart to throw off the message, and he may have been willing to do so. But it was not a part of his duty to do it. And what he did, he did voluntarily as an accommodation. The case of *Davies* v. *Steamboat Company*, supra, is instructive upon this point.

And it is argued with much force, and we think fairly, that even if it were otherwise, the railroad company would have no reason to expect that a baggage master in a car with two high and wide doors on the side, as here, made on purpose to be used by him, would leave the car and go down to one of the lower steps, as McTaggart must have done, if he was hit by the pipe, for the purpose of throwing off a message, when he could have done it safely and conveniently from one of the side doors of the car. The message was tied to a stick, undoubtedly for the purpose of making it easy to throw it out and away from the car.

But there is another ground also which we think is fatal to the plaintiff's case. We do not think it is proved that he was hit at all by the steam pipe. He may have been, he may not have been. Whether he was is conjectural. When last seen on the car he was not in position to be hit by it. He had thrown the message off, had completed his service, and was standing up "square." He was not seen to bend forward and look back. He was not seen or known to strike the pipe, though a man who had seen him a second or two

before was standing within six or eight feet of the pipe. He was found after having passed 27 feet beyond the pipe. The plaintiff argues that he was hit by it, because the pipe was there, where he could be hit by it, if he leaned out, and because of a bruise upon the head which could have been caused by it. The plaintiff thus shows a possibility. But that alone is not enough. She must show a probability. She must do more. She must show enough to lead a fair and reasoning mind to conclude that the pipe actually hit McTaggart. *Seavey* v. *Laughlin*, 98 Maine, 517. She might, in a supposed case, do this by showing some distinctive mark upon the pipe, as hair or blood, or some bruise upon the head that was peculiar to the pipe, or she might by elimination or exclusion of other causes lead to a natural conclusion that he was hit by the pipe. There is, in this case, however, another theory which, for anything that we know or is proved, seems equally plausible to account for his injury. The case shows that the train quickened its speed as it left the bridge, and that McTaggart was standing on the steps of the car. If, when the train started up quickly, or if for any other reason, McTaggart lost his balance, and fell out, all the remaining circumstances are as well accounted for as upon the plaintiff's theory. There was nothing in the appearance of the bruise back of the ear which might not as well be attributed to his hitting some part of the coal bin as he fell, as to his hitting the steam pipe. But it is said, this is conjecture. So it is. But is not the other theory conjecture, also? Both are conjectures, one seemingly as plausible as the other. And either might be the truth. But conjectures are not proof. A proposition is not proved so long as the evidence furnishes ground for conjecture only, or until the evidence becomes inconsistent with the negative. *Smith* v. *Lawrence*, 98 Maine, 92. Can we say then that it is proved that the pipe hit the deceased? Might a jury properly say it? Would a jury be warranted selecting upon which of two conjectures they would base a verdict? And the burden of proving being upon the plaintiff, might they select a conjecture favorable to her, and reject the other? Certainly not. *Seavey* v. *Laughlin*, supra. Nor does this militate against the doctrine that the reasonable inferences drawn by juries from undisputed facts will not be disturbed.

That implies judgment and decision.    That involves the weighing of the evidence and the formation of belief, from the evidence.    It is not a mere process of arbitrary selection.    To choose between two possibilities is guess work, and not decision, unless there is something more which may lead a reasoning mind to one conclusion rather than to the other.    We think there is no such determining factor in this case.

Therefore, for the reasons stated, we are of opinion that the plaintiff is not entitled to get or hold a verdict.

*Judgment for defendant.*